AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

06/01/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

June 1, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

United States of America

v.

Shahil Ammar Rizvi,

Defendant

Case No. 5:21-mj-00385

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 14, 2020 in the county of Riverside in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Distribution of Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Anthony Herrera Jacobs, Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  June 1, 2021

_____
*Judge's signature*

City and state:  Riverside, California

Hon.Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Anthony Herrera Jacobs, being duly sworn, declare and state as follows:

## I.  <u>PURPOSES OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against SHAHIL AMMAR RIZVI ("RIZVI") for a violation of Title 21 United States Code, Sections 841(a)(1), (b)(1)(C)(distribution of controlled substances) which occurred on or about September 14, 2020.

2.   This affidavit is also made in support of applications (1) for a warrant to search a single family home located at 1075 Bascomb Drive, Riverside, California 92507 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, (2) for a gray 2020 Tesla Model Y vehicle (the "SUBJECT VEHICLE") as described more fully in Attachment A-2, and (3) for the person of RIZVI as described more fully in Attachment A-3.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute, or distribution of, a controlled substance), 843(b) (use of communication facility to commit drug offense), 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance), and 18 U.S.C. § 1956(a)(1) (money laundering)  (collectively described as the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants arrest warrants, and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF POSTAL INSPECTOR JACOBS</u>

5.    I am a United States Postal Inspector ("Postal Inspector") employed by the Los Angeles Division of the United States Postal Inspection Service ("USPIS").  I joined USPIS in August 2003.  I have completed a twelve-week Postal Inspector basic training course, which included training in the investigation of narcotics trafficking via the United States Mail.  I also have completed an advanced training course specifically designed for training investigators of narcotics mailers and shippers.  I am currently assigned to the USPIS Los Angeles Division, Narcotics Team and Parcel Task Force, which is responsible for investigating drug trafficking organizations that use parcels to distribute illegal narcotics and/or narcotics proceeds.  As part of my law enforcement duties, I have conducted numerous parcel investigations that have resulted in the arrest of individuals who have received and distributed

controlled substances, as well as the seizure of the illegal
drugs and proceeds from the sale of those illegal drugs.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    Between September 2020 and December 2020, RIZVI
entered USPS facilities in Riverside, California and shipped at
least nine USPS Priority Mail Express parcels which contained an
approximate total of over 1,000 grams of cocaine, 200 grams of
Adderall (amphetamine-based drug), approximately 100 grams of
alprazolam (Xanax), and 200 pills containing MDMA (ecstasy).  On
May 25, 2021 and on May 27, 2021, RIZVI entered USPS facilities
in Riverside, California and shipped at least three additional
USPS Priority Mail Express parcels which contained an
approximate total of 199 grams of a substance believed to
contain MDMA, 14 grams of a substance believed to contain
alprazolam (Xanax), and 32 grams of a substance believed to
contain heroin.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.    Based on my conversations with other law enforcement
officers and my own knowledge of the investigation, I am aware
of the following:

**A.    Investigation Begins:  RIZVI Mails Cocaine to Ohio on
September 14, 2020**

On September 15, 2020, I spoke with Cleveland, Ohio based
Postal Inspector Marc Kudley about a USPS parcel with tracking
number EJ399560647US, which had been mailed from a USPS facility
located at 4150 Chicago Avenue, Riverside, California 92507
("Riverside Main Post Office") on September 14, 2020.  Inspector

Kudley had reason to believe the parcel contained drugs or the proceeds from the sale of drugs and obtained a warrant from the Honorable Jonathan D. Greenberg for the Northern District of Ohio (Case No. 20-MJ-4324).  Inspector Kudley opened the parcel and told me that there was approximately half a kilogram of suspected cocaine inside the parcel.  The substance was later sent to the USPIS forensic laboratory and confirmed to be cocaine.

8.   On September 17, 2020 I went to the Riverside Main Post Office and reviewed video surveillance from September 14, 2020 to identify the mailer of the parcel containing suspected cocaine.  I saw a young male suspect (later identified as RIZVI) mailing the parcel containing suspected cocaine, and downloaded still images and video footage for future use.  In the surveillance footage, I saw RIZVI mailing four parcels, which he paid for in cash.  As he was leaving, RIZVI also stopped to grab additional USPS Priority mailing boxes and labels.  I showed the video to management at the Riverside Main post office and asked them to inform me if RIZVI returned.

**B.    RIZVI Mails Cocaine to New Jersey on September 29, 2020**

9.   On September 29, 2020, I received a call from USPS employee T.F. from the Riverside Main Post Office.  T.F. told me that a man matching RIZVI's description was in the lobby attempting to mail three parcels.  One of the three parcels was labeled with tracking number EJ399560681US and was bound for New

Jersey.  I instructed T.F. to set the parcel aside so that I could inspect it further.

10.  After further investigation, on October 2, 2020, I obtained a search warrant signed by the Honorable Kenly Kato for parcel EJ399560681US (Case No. 5:20-MJ-00530).  I then opened the parcel and saw that it contained approximately 241 grams of suspected cocaine.  The substance was later sent to the USPIS forensic laboratory and confirmed to be cocaine.

**C.    RIZVI Mails Cocaine to Massachusetts on October 21, 2020**

11.  On October 21, 2020, T.F. called me again and told me that RIZVI had mailed parcels again on October 20, 2020.  One of the parcels was labeled with tracking number EJ294565335US and was bound for Massachusetts.  I instructed T.F. to set the parcel aside so I could inspect it further.

12.  After further investigation, on October 27, 2020, I obtained a search warrant signed by the Honorable Sheri Pym for parcel EJ294565335US (Case No. 5:20-MJ-00566).  I then opened the parcel and saw that it contained approximately 146 grams of suspected cocaine.  The substance was later sent to the USPIS forensic laboratory and confirmed to be cocaine.

**D.    RIZVI Mails Cocaine, Xanax, and Adderall to New York on October 22, 2020**

13.  On October 22, 2020, T.F. called me again and told me that RIZVI had mailed parcels again on October 21, 2020.  One of the parcels was labeled with tracking number EJ483230742US and was bound for New York. I instructed T.F. to set the parcel aside so I could inspect it further.

14.   After further investigation, on October 27, 2020, I
obtained a search warrant signed by the Honorable Sheri Pym for
parcel EJ483230742US (Case No. 5:20-MJ-00565).  I then opened
the parcel and saw that it contained approximately 29 grams of
suspected cocaine, 212 grams of suspected Adderall tablets, and
approximately 100 grams of suspected Xanax tablets.  The
substances were later sent to the USPIS forensic laboratory and
confirmed to be cocaine, Adderall, and Xanax.

 **E.** **December 1, 2020, RIZVI Mails Cocaine to North
  Carolina, Arizona and Minnesota, and he Mails MDMA to
  North Carolina and Louisiana**

15.   On December 1, 2020, T.F. called me again and told me
that RIZVI was in the lobby attempting to mail more parcels.
Four of the parcels were labeled with tracking numbers
EJ483239715US, EJ483239724US, EJ483239698US, and EJ483239707US
and were bound for North Carolina, Arizona, Louisiana, and
Minnesota, respectively.  I instructed T.F. to set aside these
four parcels.

16.   On December 9, 2020, I obtained a search warrant for
the parcels signed by the Honorable Shashi Kewalramani (Case No.
5:20-MJ-00646).  I then opened the parcels and saw that they
contained the following:

 a.   Inside USPS parcel EJ483239715US bound for North
Carolina: approximately 245 grams of suspected MDMA pills and
approximately 115 grams of suspected cocaine.  The substances
were later sent to the USPIS forensic laboratory and confirmed
to be MDMA and cocaine.

 b.   Inside USPS parcel EJ483239724US bound for

Arizona:  approximately 171 grams of suspected cocaine.  The substance was later sent to the USPIS forensic laboratory and confirmed to be cocaine.

   c.   Inside USPS parcel EJ483239698US bound for Louisiana:  approximately 104 grams of suspected MDMA pills which were bright orange in color and had the "Tesla" car logo printed on them.  The substance later was sent to the USPIS forensic laboratory and confirmed to be MDMA.

   d.   Inside USPS parcel EJ483239707US bound for Minnesota: approximately 31 grams of suspected cocaine.  The substance was later sent to the USPIS forensic laboratory and confirmed to be cocaine.

   **F.   RIZVI's Arizona Customer, S.L., Comes to California to Find his "Missing" Cocaine Parcel**

  17.  On December 16, 2020, USPS Express Mail Clerk J.S. called me and told me that a young Asian male (later identified as S.L.), had arrived in person at the San Bernardino Processing and Distribution Plant and was asking about the USPS parcel labeled with tracking number EJ483239724US (which was bound for Arizona and contained approximately 171 grams of suspected cocaine).[1]  S.L. only provided a first name and said he had just driven out and would only be in the area for a short time.

  18.  After learning that the parcel was bound for a USPS Post Office Box, I searched USPS databases to see if anyone with

---

[1] The parcel was addressed to S.L. at 1776 N. Scottsdale Rd. #2260 Scottsdale, AZ 85252, a Post Office box at a USPS facility.

S.L.'s last name had applied for the specific USPS Post Office box number listed on the parcel.

19.   I determined that the USPS Post Office box number holder is named S.L., with an address at 2633 E. Culver Street Phoenix, Arizona 85008.  I also determined, based on the USPS database, that Arizona Driver's License #D0949XXXX was associated with the USPS Post Office box number, as well as an email address that incorporated S.L.'s name into the email address itself.

20.   Using the information from the USPS database, I obtained a driver's license photo of S.L. and showed it to USPS clerk J.S.  J.S. confirmed that S.L. was the person who had come to the processing plant on December 16.

21.   I was also able to obtain surveillance video footage from the San Bernardino Processing plant from December 16, 2020. After reviewing the surveillance video, I located video footage of S.L. meeting with J.S. to discuss the parcel.  I showed J.S. the footage, and he confirmed that the footage showed S.L. meeting with Serrano to discuss the parcel.

**G.    USPIS Lab Uses Fingerprints to Identify RIZVI**

22.   I sent all of the parcels noted above to the USPS Forensic Laboratory in Dulles, Virginia for fingerprint analysis.

23.   On May 3, 2021, Ms. Jillian Vesey, Forensic Latent Print Analyst, authored a report which identified 180 latent fingerprints on the packing material inside eight of the parcels.  Ms. Vesey reported that she had compared the

fingerprints on the packing material to the FBI's fingerprint
database and found several matches.  Specifically, Ms. Vesey
determined with a reasonable degree of scientific certainty that
the majority of the fingerprints on the packing material
belonged to RIZVI.

24.  When I learned that RIZVI's fingerprints were found
inside the parcel I searched for RIZVI's photograph in the
California Department of Motor Vehicles ("DMV") database by
using his FBI Identification Number.  I then obtained and
compared RIZVI's California DMV photograph to the man depicted
in the surveillance video from September 2020 through December
2020 and determined that they were the same person.

### H.    RIZVI Lives in Riverside, Drives a Tesla, and Moves Large Sums of Money Around

25.  Once I identified RIZVI, I began to investigate him
further.  On May 14, 2021, FBI Special Agent Fred Grimm arranged
for the installation of a video camera on a public light post on
Bascomb Drive in Riverside, California, where RIZVI was believed
to be living.

26.  Between May 16, 2021 and May 27, 2021, the light post
camera routinely captured RIZVI arriving to and departing from a
single family home located at 1075 Bascomb Drive Riverside,
California 92507 (arriving and departing on at least ten
different days during the timeframe).  Whenever RIZVI arrived or
departed, it was in a gray colored 2020 Tesla Model Y vehicle,
bearing Vehicle Identification Number 5YJYGDEE8LF038608 and
license plate number 8SAU797, which he would routinely leave

parked on the curb in front of the residence overnight and
during the day.  On RIZVI's driver's license, he lists an
address in Corona, California as his mailing address.  I learned
through subsequent investigation that the address in Corona is a
home occupied by RIZVI's mother.  Accordingly, I believe that
RIZVI at one time used his mother's address as a mailing
address, but now resides full-time at the home on Bascomb Drive
in Riverside.

27.  DMV records show that the Tesla bearing Vehicle
Identification Number 5YJYGDEE8LF038608 and license plate number
8SAU797 is registered to RIZVI and is owned outright, with no
lienholder in place.  The Tesla is estimated to sell at retail
for approximately $50,000.  Visual surveillance of the Tesla
shows that the front and back of the Tesla has a Tesla logo
which appears to have been modified to appear orange/red in
color from its original white.  The back of the Tesla has the
letters "C" and "P" stamped on the trunk.

28.  I learned through surveillance and subsequent
investigation that RIZVI is a resident of Riverside, California
and has been employed at a local smoke shop called Rodeo Smoke
Shop and Glass Gallery, located on Massachusetts Avenue in
Riverside, California.

29.  Through subsequent investigation, I also learned that
RIZVI uses JPMorgan Chase for his personal banking services, and
since 2018, has deposits and withdrawals each totaling over
$600,000 in his checking account (much of it in the form of

digital transactions through Venmo, Paypal, Zelle, and other
services).

    **I.   RIZVI Drives Drugs from Bascomb Drive Home to USPS
Facility in his Tesla**

    30.  On May 25, 2021, I learned through the street post
camera footage that RIZVI walked out of his house at 1075
Bascomb Drive, Riverside, California 92507 with multiple
parcels, loaded the parcels into his Tesla bearing Vehicle
Identification Number 5YJYGDEE8LF038608 and license plate number
8SAU797, and drove away.  I then learned through USPS
surveillance footage that RIZVI, within minutes, entered a USPS
facility located at 3681 Sunnyside Drive in Riverside,
California and mailed two parcels destined for Florida and
Redondo Beach, California.  I retrieved the parcels and set them
aside for further inspection.  The parcel bound for Florida was
labeled with tracking number EJ769999603US, and the parcel bound
for Redondo Beach was labeled with tracking number
EJ769999594US.

    31.  On May 27, 2021, I learned through the street post
camera footage that RIZVI walked out of his house at 1075
Bascomb Drive, Riverside, California 92507 with a parcel, loaded
the parcel into his Tesla bearing Vehicle Identification Number
5YJYGDEE8LF038608 and license plate number, and drove away.  I
then learned through USPS surveillance footage that RIZVI,
within minutes, entered the same USPS facility from May 25, 2021
and mailed the parcel to New York.  I retrieved the parcel,

which was labeled with tracking number EJ769999625US, and set it aside for further inspection.

32.  On May 28, 2021, after further investigation, I obtained a search warrant for the parcels signed by the Honorable Sheri Pym (Case No. 5:21-MJ-00380).  I then opened the parcels and saw that they contained the following:

a.  Inside USPS parcel EJ769999603US bound for Florida: approximately 152 grams of suspected MDMA (I believe these to be MDMA because they are the same bright orange colored pills with a Tesla logo as the laboratory-confirmed MDMA pills that RIZVI shipped to Louisiana in December 2020);

b.  Inside USPS parcel EJ769999594US bound for Redondo Beach, California:  approximately 14 grams of white pills with "Xanax" printed on them;

c.  Inside USPS parcel EJ769999625US bound for New York:  approximately 47 grams of suspected MDMA (the same orange-colored, Tesla logo stamped pills previously described), and approximately 32 grams of a white powdery substance which field-tested positive for the presence of heroin.

**V.  <u>TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING</u>**

33.  Based on my training and experience and information obtained from other law enforcement officers who investigate drug trafficking, I know the following:

a.  The distribution of drugs is a continuing criminal activity that occurs over months, and often years. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture,

transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, including tablets, such as ipads.

b. Drug traffickers use telephones, portable cellular and digital telephones, pagers, and other communication devices, sometimes in fictitious and/or other individuals' names, and maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the drug-trafficking organization, as well as customers of their drug trafficking business.

c. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

d. Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest. Communications between people buying and selling drugs take place by telephone calls and messages, such

13

as e-mail, text messages, and social media messaging
applications, sent to and from cell phones and other digital
devices.  This includes sending photos or videos of the drugs
between the seller and the buyer, the negotiation of price, and
discussion of whether or not participants will bring weapons to
a deal.  In addition, it is common for people engaged in drug
trafficking to have photos and videos on their cell phones of
drugs they or others working with them possess, as they
frequently send these photos to each other and others to confirm
that they are in possession of the drugs, boast about the drugs,
or facilitate drug sales.  It is also common for drug
traffickers to carry cellular telephones in order to remain in
contact with drug suppliers or customers, to communicate with
co-conspirators to facilitate drug trafficking, to coordinate
the movements of the trafficker and various co-conspirators, and
to coordinate the amount of drugs trafficked, as well as payment
amounts and methods.  It is common for drug traffickers to
accept orders and payments for drugs prior to drugs being
delivered, especially in the case of drugs being shipped using
the Postal Service.  Accordingly, there is often a lag between
the time drugs are ordered and paid for, and the time they are
received by the purchaser.  Based on my training and experience,
I know that the above-described information can be stored on
digital devices carried by drug traffickers.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

34.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

36.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RIZVI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of RIZVI's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

37.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VII. <u>CONCLUSION</u>

38.  For all of the reasons described above, there is probable cause to believe that, on or about September 14, 2020, RIZVI committed a violation of Title 21 United States Code, Sections 841(a)(1), (b)(1)(C)(distribution of controlled substances).

39.  Furthermore, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and the person described in Attachments A-1, A-2, and A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>1st</u> day of
June, 2021.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE